# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### HAMMOND DIVISION

ROBERT BURNS,              )
                                  )
       Plaintiff,         )
                                  )
v.                           )     Cause No. 2:12-CV-034
                                  )
LAKE COUNTY INDIANA SHERIFF   )
JOHN BUNCICH, et al.,[1]         )
                                  )
       Defendants.     )

## OPINION AND ORDER

This matter is before the Court on the motion for summary judgment and memorandum in support filed by Defendants Mac McClesky and Larry Chase (docket entries 96 and 97). Plaintiff Robert Burns filed a response in opposition to the motion and a supplemental response (DE 100 and 102), and the Defendants filed a reply (DE 104). The Defendants also filed a motion to strike, asking the Court to strike Burns's pleadings in opposition to the summary judgment motion (DE 103). Burns did not file a response to that motion. For the reasons discussed below, the motion to strike is DENIED and the motion for summary judgment is GRANTED in part, DENIED in part, and MOOT in part. The motion is denied as to Plaintiff's claim against the

---

[1] Burns filed his original Complaint in this case on January 20, 2012, naming as defendants John Buncich, the Sheriff of Lake County, Indiana, the county itself, several Lake County commissioners, the warden of the Lake County Jail, and numerous other individuals who worked at the jail in some capacity. The Court determined that the original Complaint was too vague and failed to state a claim, struck the filing, and allowed Burns an opportunity to file an Amended Complaint. *See* Court Order (DE 4). This case was later stayed to allow Burns additional time to gather documents he said he needed to file a proper Amended Complaint. *See* Court Order (DE 16). On September 16, 2014, Burns filed his Amended Complaint, which is the controlling complaint in this case (DE 23). The Court reviewed that Amended Complaint and lifted the stay so this case could proceed. *See* Court Order (DE 25). The only defendants remaining in this case are the movants, McClesky and Chase, both of whom served as chaplains at the Lake County Jail at the time of the alleged incidents giving rise to this lawsuit.

Defendants, in their individual capacities, for violation of his constitutional right to the free exercise of his religion; the motion is granted as to Plaintiff's claims against the Defendants in their official capacities and those claims are dismissed; and the motion is moot as to Plaintiff's claim under the Religious Land Use and Institutionalized Persons Act (RLUIPA). This case will be set for a scheduling conference by separate entry.

## BACKGROUND

Burns, proceeding *pro se*, was incarcerated in the Lake County Jail from January of 2011 through December of 2012. Burns asserts in his Amended Complaint that he is a Jehovah's Witness and that McClesky and Chase, who served as chaplains in the Lake County Jail, infringed on his right to practice his religion while he was incarcerated in the Jail. Amended Complaint, p. 3. More specifically, Burns alleges that McClesky and Chase expressed disapproval of Burns's religious beliefs (*id*.); that they ignored his repeated written requests (ten of them, he says, between January 1, 2011, and July 10, 2011) to be permitted to attend worship services with other Jehovah's Witnesses (*id*.); that they forced Burns to worship in a hallway or crowded, noisy holding cell (while his minister sat outside the cell) rather than in the Jail's chapel (*id*., p. 4); that they denied him visits with his minister (*id.*); and that they maintained a policy that inmates who were Jehovah's Witnesses had to be placed on a list to attend services, but that no such requirement was imposed on inmates of other religions (*id*., pp. 7-8). Burns states that he "was in Lake County Jail for 94 weeks, but I [was] only allow[ed] to go to service about 20 times, and sometimes we had to have service through a crack in the door." *Id*., p. 6. He also states that he sent numerous letters and filed numerous prison grievances concerning these matters, but that the Defendants ignored them. *Id*. Burns brings this action under 42 U.S.C. §

1983, asserting that McClesky and Chase's actions "violated my 1st and 14th Amendment rights." *Id.* Burns seeks compensatory and punitive damages for the alleged constitutional violations. *Id.*, p. 5. He also, arguably, states a claim under the RLUIPA, as discussed below.

Defendants Chase and McClesky contend that they are entitled to summary judgment on Burns's claim of religious discrimination for two reasons: first, "because of the lack of personal involvement by Chase and McClesky[]" in the Jail's alleged discriminatory policies or procedures; and second because "the policies of the Lake County Jail did not discriminate against Burns on the basis of his standing as a Jehovah's Witness." Defendants' Memorandum, p. 1. In short, the Defendants contend that they had no authority and played no role in establishing or modifying the Jail's policy regarding religious accommodation and so cannot be held liable in their official capacity, and that they lacked the requisite personal involvement in the alleged constitutional violations and so cannot be held liable in their individual capacities. Chase and McClesky assert that "there is no evidence regarding any personal involvement giving rise to liability for Chase and McClesky because the institution, i.e. the Lake County Jail, as well as those persons in charge of said institution are the policy makers regarding who, what, when and where [a] detainee at the Lake County jail exercises his faith." *Id.* If Chase and McClesky had no direct involvement in the alleged unconstitutional conduct, they cannot be sued under § 1983. "Liability under Section 1983 is predicated on a defendant's personal involvement in the alleged constitutional violation." *Jones v. Gaetz*, 2017 WL 1132560, at *5 (S.D. Ill. Mar. 27, 2017) (citing *Palmer v. Marion Cnty.*, 327 F.3d 588, 594 (7th Cir. 2003)).

The Defendants argue that neither they nor Jail policy interfered with Burns's ability to worship as a Jehovah's Witness and that Burns's complaints are "based entirely on the *manner in*

*which* he was able to worship his faith . . . not on an alleged *denial to worship*." Defendants'

Memorandum, p. 5 (italics added). They concede that "[p]risoners have a right to exercise their

religion under the Free Exercise Clause of the First Amendment. . . ." but they also note that

"[n]evertheless, restrictions that limit the exercise of religion are permissible if they are

reasonably related to legitimate penological objectives . . . ." *Id*. (citations omitted). The

Defendants argue that any obstacles Burns might have faced regarding the exercise of his religion

were the result of reasonable penological restrictions related to jail administration rather than any

policy that discriminated against any inmate on the basis of his religious preference. *Id*.,

generally. They point out that courts must give "'due deference to the experience and expertise of

prison and jail administrators in establishing necessary regulations and procedures to maintain

good order, security and discipline, consistent with consideration of costs and limited

resources.'" *Id*, p. 8 (quoting *Cutter v. Wilkinson*, 544 U.S. 709, 723 (2005)). The Defendants

contend that the impediments or obstacles that Burns says placed a "substantial burden" on his

ability to practice his religion were in fact only inconveniences, that they did not prevent him

from worshiping as a Jehovah's Witness anytime he wanted, and that his allegation that these

inconveniences constituted a "substantial burden" is based only on his subjective belief that he

was the victim of a discriminatory Jail policy or was treated unfairly by Chase and McClesky,

who Burns claims were personally biased against Jehovah's Witnesses. The Defendants contend

that the scheduling of religious services and religious visits in the Jail must be done in a manner

that takes into consideration the Jail's resources, security concerns, and disciplinary concerns. *Id*.

**STANDARD OF REVIEW**

Summary judgment is appropriate when the record shows that there is "no genuine issue

4

as to any material fact and that the moving party is entitled to a judgment as a matter of law."
Fed.R.Civ.P. 56©; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Disputes concerning
material facts are genuine where the evidence is such that a reasonable jury could return a verdict
for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding
whether genuine issues of material fact exist, the court construes all facts in a light most
favorable to the non-moving party and draws all reasonable inferences in favor of the non-
moving party. *See id.* at 255. However, neither the "mere existence of some alleged factual
dispute between the parties," *id.,* 477 U.S. at 247, nor the existence of "some metaphysical doubt
as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586
(1986), will defeat a motion for summary judgment. *Michas v. Health Cost Controls of Ill., Inc.*,
209 F.3d 687, 692 (7th Cir. 2000).

Summary judgment is not a substitute for a trial on the merits nor is it a vehicle for
resolving factual disputes. *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994).
Therefore, after drawing all reasonable inferences from the facts in favor of the non-movant, if
genuine doubts remain and a reasonable fact-finder could find for the party opposing the motion,
summary judgment is inappropriate. *See Shields Enterprises, Inc. v. First Chicago Corp.*, 975
F.2d 1290, 1294 (7th Cir. 1992); *Wolf v. City of Fitchburg*, 870 F.2d 1327, 1330 (7th Cir. 1989).
If it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish
his or her case, summary judgment is not only appropriate, but mandated. *See Celotex*, 477 U.S.
at 322; *Ziliak v. AstraZeneca LP*, 324 F.3d 518, 520 (7th Cir. 2003).

Finally, since Burns is proceeding *pro se*, the court is required to liberally construe his
complaint. *Haines v. Kerner*, 404 U.S. 519, 520 (1972). *See also*, *McCormick v. City of Chicago*,

230 F.3d 319, 325 (7th Cir. 2000) ("It is well-settled law that *pro se* complaints are to be liberally construed and not held to the stringent standards expected of pleadings drafted by lawyers.").

**DISCUSSION**

**I. Motion to strike.**

The Defendants argue that Burns's pleadings in opposition to the motion for summary judgment should be stricken because they were filed more than two weeks after the deadline set in Federal Rule 56 and Local Rule 56-1. Motion to Strike (DE 103), p. 1. They note that "the time limit for filing the Plaintiff's Response was on or before 28 days from November 17, 2016," which was the date the Defendants served Burns with a notice of their motion. *Id*. (*see* Notice of Summary Judgment Motion (DE 50)). The Court also sent Burns a notice explaining that the Defendants were seeking summary judgment on his claims. Notice and Order (DE 51). Those two notices included detailed information and instructions to assist Burns, given his *pro se* status, in responding to the motion. As the Defendants correctly point out, "[a]lthough *pro se* parties are entitled to some procedural protection, including liberal construal of documents, even *pro se* parties must comply with procedural rules." Motion to Strike, p. 2. The Defendants emphasize that "[i]t is 'well established that *pro se* litigants are not excused from compliance with procedural rules.'" *Id*. (quoting *Pearle Vision, Inc. v. Romm*, 541 F.3d 751, 758 (7th Cir. 2008)). As stated at the outset, Burns did not respond to the motion to strike.

The Court concludes that striking Burns' most recent pleadings because they were two weeks late would be an unnecessarily harsh sanction for several reasons. First, Burns is proceeding *pro se*, and he has actively litigated this case from its inception, which includes making numerous filings, responding to numerous defense motions and court orders, and

participating in discovery–all with no history of dilatory conduct. Also, striking Burns's recent

pleadings would have no practical effect since they largely just mirror or duplicate arguments and

items of purported evidence that Burns has submitted in this case before.[2] So, even though Burns

was about two weeks tardy filing his response, it is difficult to see how the Defendants suffered

any harm or prejudice as a result–and, in fact, they do not argue that they have been prejudiced.

The Defendants even concede in their reply brief that "Burns's reply to Defendant's motion to

summary judgment is a virtual rehashing of his complaint[.]" Defendants' Reply, p. 2. For these

reasons, striking Burns's pleadings is not warranted, the Court will consider them for purposes of

the motion for summary judgment, and the motion to strike is DENIED.[3]

### II. Motion for summary judgment.

While neither party cites it, discusses it, or even mentions it anywhere in their briefs, this

case is a mirror image of *Roy v. Dominguez*, 2012 WL 279485 (N.D.Ind. Jan. 31, 2012). The

plaintiff in that case, also a Jehovah's Witness, sued the Lake County sheriff and others alleging

his religious rights were violated while he was incarcerated at the Lake County Jail. He sought

damages under § 1983 and injunctive relief under the RLUIPA. This Court (Judge Moody)

---

[2] For example, when responding to Defendants' previous motion for summary judgment in this case (dealing solely with the issue of exhaustion of administrative remedies), Burns filed nearly 100 pages of pleadings, witness statements, and other documentary evidence he claims supports his claim of religious discrimination. Plaintiff's Response (DE 59 and 59-1).

[3] The Court acknowledges that many documents Burns filed are likely inadmissible for various reasons (on hearsay or relevance grounds, for example). Some of them are discussed in this order for purposes of context, but were not considered in support of any of Burns's arguments. The fact issues and credibility issues that preclude summary judgment arise from sworn statements from Burns himself, so the Court did not rely on any of Burns's proffered evidence when analyzing and resolving the motion for summary judgment. The degree to which any of Burns's proposed evidence can be presented in admissible form at trial is an issue for another day.

summarized Roy's claim as follows:

> The crux of the claim set out in Roy's amended complaint is that he is a Jehovah's
> Witness, and that defendants violated his federally protected rights when they did
> not allow Jehovah's Witnesses to conduct group worship in the jail chapel located
> on the jail's third floor even though other denominations were allowed to do so,
> and when they made it difficult for his minister to give him spiritual guidance.

*Roy*, 2012 WL 279485, at *1. The resolution of the present motion for summary judgment

likewise mirrors Judge Moody's holdings in *Roy*, and for the same reasons. It is understandable

that the Defendants would not be anxious to shine a light on the *Roy* case, but they avoid it

altogether instead of trying to distinguish it. On the other hand, there isn't much to distinguish,

since that case dealt with the same issues, the same applicable law, and even the same basic

underlying facts! [4] Then there's the fact that the same law firm and same attorneys acted as

defense counsel in both cases. Be all that as it may, the present summary judgment must be

granted in part, denied in part, and mooted in part for the reasons discussed in this order, and the

*Roy* case helps explain why.

Burns has filed dozens, perhaps hundreds, of pages of written pleadings and purported

supporting documents over the course of this litigation. As is often the case with *pro se* plaintiffs,

who feel compelled to provide lengthy and detailed accounts of their claims and the facts

underlying them, his many pleadings are often duplicative and repetitive. But the sole issue in

this case is whether Defendants Chase and McClesky, in their individual capacities, official

---

[4] This is not a coincidence. Burns met Kevin Roy while the two were incarcerated in the
Lake County Jail. Amended Complaint, p. 4. In fact, Burns states as follows: ". . . I met a
Jehovah's Witness name[d] Kevin D. Roy. When Mr. Roy went to service I wanted to go too, but
was told I couldn't go because my name wasn't on the list. This is not right because th[ere] is not
a list for any other faith." *Id*. He also states that he attended worship services with Roy, at least
on one occasion. *Id*.

capacities, or both, unreasonably infringed on Burns's constitutional right to exercise his religion while he was incarcerated in the Lake County Jail. On that issue, Burns's extensive pleadings recount the many obstacles he claims he faced when trying to exercise that right. He argues that those obstacles–imposed by the Defendants–prevented him from freely practicing his religion, and he seeks both compensatory and punitive damages for this alleged constitutional violation.

Because Burns was incarcerated when he filed his Amended Complaint, the Court was required to "screen" the Complaint pursuant to 28 U.S.C. § 1915A "and dismiss it if the action is frivolous or malicious, fails to state a claim, or seeks monetary relief against a defendant who is immune from such relief. To survive dismissal, a complaint must state a claim for relief that is plausible on its face." *Stone v. Levenhagen*, 2014 WL 4199282, at *1 (N.D. Ind. Aug. 25, 2014) (citing *Bissessur v. Indiana Univ. Bd. of Trs.*, 581 F.3d 599, 602 (7th Cir. 2009)). The Court did that and issued an order on September 29, 2014 (DE 25) granting Burns "leave to proceed against Chaplain Larry Chase and Chaplain Mac McClesky in their individual and official capacities for compensatory and punitive damages for denying and interfering with his right to communal worship as a Jehovah's Witness at the Lake County Jail in violation of the First Amendment and the Religious Land Use and Institutionalized Persons Act." Court Order, p. 3. The RLUIPA "prohibits correctional facilities receiving federal funds from imposing a substantial burden on an inmate's religious exercise unless prison officials can demonstrate 'that imposition of the burden on that person: (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest.'" *Joseph v. Superintendent*, 2017 WL 1196827, at *3 (N.D.Ill. Mar. 31, 2017) (quoting 42 U.S.C. § 2000cc-1(a)(1)-(2)). The Court permitted Burns to proceed on an RLUIPA claim because he included the

following language in his Amended Complaint:

> I'm suing Mac [McClesky and] Chase . . . to have the Jehovah's Witnesses restored to their original religious freedom they once shared by being able to freeley [sic] go throughout the old & new Jail building counseling inmates. I'm suing . . . to have Jehovah's Witnesses' rights respected and to have my rights honored.

Amended Complaint, p. 5. Since that language could be construed as a request for some sort of equitable relief, the Court concluded that Burns had stated a claim under the RLUIPA, at least sufficiently to survive the § 1915 initial screening. On closer examination, however, it is clear that any claim under the RLUIPA that Burns arguably included in his Amended Complaint is moot. (It is not clear whether Burns really intended to include such a claim in the first place, as discussed below.) The Court will address this claim first.

**A. RLUIPA claim.**

Burns's Amended Complaint, as well as all of his other pleadings including his most recent, are devoted almost exclusively to explaining how the Defendants allegedly interfered with his ability to practice his religion by not respecting his wishes to worship in the Jail chapel, not letting him attend services more frequently, and not letting him visit with his ministers more frequently. Aside from the two sentences quoted above, Burns makes no argument or pleas for equitable or injunctive relief. His request for money damages, on the other hand, is unambiguous: he seeks $100,000.00 from each Defendant as compensatory damages and the same amount from each as punitive damages. Amended Complaint, p. 5. A plaintiff asserting a claim under the RLUIPA, however, is entitled only to injunctive relief, not money damages. *See Sossamon v. Texas*, 563 U.S. 277, 288 (2011) (RLUIPA does not permit claims for money damages against states or prison officials in their official capacity); *Vinning-El v. Evans*, 657 F.3d 591, 592 (7th

Cir. 2011) (RLUIPA does not permit recovery of money damages against prison officials in their individual capacities); *Nelson v. Miller*, 570 F.3d 868, 886-89 (7th Cir. 2009) (same). In this case, Burns has pleaded a claim pursuant to § 1983 and he seeks money damages. He has not pleaded sufficient facts to support a claim for relief under the RLUIPA and presents no argument in support of a request for equitable relief.

Also, Burns's request that Jehovah's Witness adherents should be permitted "to [freely] go throughout the old [and] new Jail building counseling inmates," considered in light of his complaint that he was deprived of the ability to counsel directly with a Jehovah's Witness minister, could be construed as a request for equitable relief asking the Court to order the Lake County Jail to permit Jehovah's Witness ministers greater access to the Jail to ensure that "Jehovah's Witnesses' rights [are] respected." This is not a valid basis for any claim because Burns has no standing to seek relief on behalf of others. Judge Moody noted the same thing in *Roy*, holding that "Roy . . . suggests that he seeks to vindicate the rights of his group and of other Jehovah's Witness inmates at the [Lake County] jail, but a § 1983 plaintiff cannot assert the rights of others." *Roy*, 2012 WL 279485, at *2 (citing *Higgason v. Farley*, 83 F.3d 807, 811 (7th Cir. 1996)).

In addition, again assuming that Burns intended to include an RLUIPA claim, any claim for injunctive relief is moot because he is no longer housed at the Lake County Jail. The record reflects that Burns was released or transferred from the Lake County Jail to the Cook County Jail in Chicago at the end of 2012. *See* DE 12 (Letter from Burns's regarding change of address to Cook County Jail, filed January 4, 2013). More than four years later, he remains incarcerated in Illinois. Judge Moody addressed the same issue in *Roy*, explaining and holding as follows:

> If a prisoner is released or transferred to another prison, his request for injunctive relief is moot unless "he can demonstrate that he is likely" to return to his original facility. *Higgason v. Farley*, 83 F.3d at 811, quoting *Moore v. Thieret*, 862 F.2d 148, 150 (7th Cir. 1988). Roy's release from custody renders his requests for injunctive relief against Lake County Jail officials moot.
>
> . . .
>
> It is possible that Roy could at some point in the future return to the Lake County Jail, but the mere possibility that this might occur is insufficient. The standard to be applied is whether he is "likely" to return to the Lake County Jail, and on the record before the Court there is no reasonable basis to conclude that he is likely to be returned to the jail.

*Roy*, 2012 WL 279485, at *3 (internal citation and quotation omitted). Similarly, there is no evidence in the record that Burns will return to the Lake County Jail nor does he state that he will, and so his release from the Lake County Jail renders moot any request for injunctive relief.

For all of the foregoing reasons, Burns's claim under the RLUIPA is dismissed as moot.

**B. Official capacity claims.**

Turning back to Burns's § 1983 claims, the Court could dedicate several pages of this order to a recitation of Burns's factual assertions, but that is not necessary. The Court has carefully reviewed Burns's pleadings and his cause of action is sufficiently summarized by the facts recited above and some additional material ones discussed below. It is clear from Burns's pleadings and supporting evidence that he did encounter obstacles in his pursuit to practice his religion while he was incarcerated, and his frustration about that is palpable in his pleadings. But as noted above, an inmate's right to freely exercise his religion can be restricted in many ways–some that might be understandably troubling to an inmate (for example, being forced to use a jail issued Bible instead of the inmate's personal Bible with handwritten

notations[5])–without amounting to a constitutional violation. To an extent, that is what happened here.

As this Court has explained:

> Prisons must permit inmates the *reasonable opportunity* to exercise religious freedom. However, prison restrictions that infringe on an inmate's exercise of his religion are permissible if they are reasonably related to a legitimate penological objective, such as security and economic concerns. The court must balance [the prisoner]'s right to be afforded a reasonable opportunity to exercise the religious freedom guaranteed by the First and Fourteenth Amendments against the legitimate penological goals of the prison. Within these confines, a prison is required to make only *reasonable efforts* to provide *some opportunity* for religious practice. This test is *less restrictive* than that ordinarily applied to infringements on constitutional rights in consideration of the need to give appropriate deference to prison officials, avoiding unnecessary judicial intrusion into security problems and other prison concerns.

*Wilkins v. Lemon*, 2016 WL 6071743, at *2 (N.D.Ind. Oct. 17, 2016) (italics added). There is no bright line test for inmate free exercise claims, and jails and prisons are afforded great deference in matters that involve jail management. That is not to say, however, that there aren't parameters, as the Court also pointed out in *Wilkins*:

> [T]he efforts of prison administrators, when assessed in their totality, must be evenhanded. Prisons cannot discriminate against a particular religion except to the extent required by the exigencies of prison administration. The rights of inmates belonging to minority or non-traditional religions must be respected to the same degree as the rights of those belonging to larger and more traditional denominations. Of course, economic and, at times, security constraints may require that the needs of inmates adhering to one faith be accommodated differently from those adhering to another. The treatment of all inmates must be qualitatively comparable.

*Id*. (citing *Maddox v. Love*, 655 F.3d 709, 719-20 (7th Cir. 2011)). If an inmate can show that he was not provided with "reasonable opportunity" to exercise his faith, he may be entitled to relief

---

[5] *Tarpley v. Allen Cty., Indiana*, 312 F.3d 895 (7th Cir. 2002).

under 42 U.S.C. § 1983. *See, e.g., Cruz v. Beto*, 405 U.S. 319, 322 n.2 (1972) ("reasonable opportunities must be afforded to all prisoners to exercise the religious freedom guaranteed by the First and Fourteenth Amendments without fear of penalty"); *Tarpley v. Allen County, Indiana*, 312 F.3d 895, 898 (7th Cir. 2002) (correctional administrators must give inmates a reasonable opportunity to exercise their religious beliefs).

Burns's main contention in this case–his only contention, really–is that he was treated less favorably than other inmates because he is a Jehovah's Witness. He supports this allegation by claiming, repeatedly throughout his sworn pleadings and other documents, that he asked continually (both verbally and in numerous written grievances) to be permitted to worship in the Jail's chapel, or at least in a quiet setting, rather than what he claims were much less appropriate settings such as his cell or a crowded holding cell. Plaintiff's Response (DE 100), generally. He also complains that other religious groups, such as Baptists, were permitted to worship in the chapel while he was denied that privilege because he was not on a list of inmates permitted to attend. *Id*., p. 2. He then states that he attended Baptist services in the Jail chapel on two occasions and "th[ere] was no list!" *Id*. (punctuation in original). He concedes that on these occasions "I and the other inmates did have to sign in when we got to the chapel. But when services for the [Jehovah's Witnesses] the officer [sic] would call out names of the inmates that could go. If you wasn't [sic] on some list you couldn't [leave] the Unit." *Id*. Burns maintains that he asked confinement officers and the Defendants on many occasions to permit him to attend religious services in the chapel but his requests were routinely ignored. Eventually, his request was granted, although he still complains that he "was not put on the list [until I had] put in a 3rd grievance." *Id*. Burns even admits that he was allowed to "go to [Jehovah's Witnesses] service

with the [Jehovah's Witnesses]" and that he met a Jehovah's Witness minister named Rockland

Hausmann (whom, Burns's own evidence shows, he communicated with frequently by letter).[6]

*Id*. Burns states that he told Hausmann that "I [had] been doing my best to get to service for a

lon[g] time[]" and that Hausmann responded by saying he had put Burns' "name on the list some

time ago to no avail." *Id*. Then Burns states that "anyway we had service in the Jail's chapel it

was [sic] about 9 of us." *Id*. So, Burns's complaint is that he had to make numerous requests and

filed multiple grievances before he was allowed to worship in the chapel. His cause of action is

summarized, in his own words, as follows:

> I went out of my way to have my rights respected at the Jail to no avail. I had
> asked [McClesky] and Chase over an[d] over to put me on the list for services
> with the Jehovah's Witnesses. I did so face to face and by way of Request form
> for a long time befor[e] I was allowed to go to service with the [Jehovah's
> Witnesses] yet [there] was no list for the other religions.

*Id*., p. 7, Affidavit of Robert Burns.

Burns clearly complains of disparate treatment. But the inquiry doesn't end there–the

ultimate issue is whether any such disparate treatment or any other alleged impediment Burns

faced amounted to a "substantial burden" on his ability to freely practice and worship as a

Jehovah's Witness. Burns's own admissions in his pleadings show that was not the case, at least

with regard to his claim against Chase and McClesky in their *official* capacities. This is because

the impediments Burns claims he encountered, as frustrating as they may have been, did not

prevent him from living as a Jehovah's Witness, praying as a Jehovah's Witness, or attending

services as a Jehovah's Witness (although not as often as he wanted). Burns might not have been

---

[6] It is undisputed that Hausmann served as a volunteer jail minister and was *not* an
employee of the Jail.

able to participate in exactly the sort of religious services he would have preferred, or to engage

in communal services in the chapel (or elsewhere) as often as he wanted, but he presents no

evidence that the Jail's religious accommodation policy deprived him of the opportunity to do

either, or to freely worship as a Jehovah's Witness anytime he wanted to do so. (And as stated, he

admits that he was "allow[ed] to go to service about 20 times" during his 94 weeks of

incarceration–although he also contends that "sometimes we had to have service through a crack

in the door." Amended Complaint, p. 6.) Jails and prisons are required to make only "*reasonable

efforts* to provide *some opportunity* for religious practice." *Wilkins*, 2016 WL 6071743, at *2.

The Defendants are correct, to an extent, when they argue that Burns's case "is based

entirely on the *manner in which* he was able to worship his faith . . . not on an alleged *denial to

worship*." Defendants' Memorandum, p. 5. Only the latter can be the basis for a constitutional

claim and in this case Burns's complaints, argue the Defendants, involve only the former. Burns

did encounter obstacles that prevented him from attending communal services under the

circumstances he would have preferred (as in a chapel rather than a holding cell or communally

rather than individually or more often than was allowed), but none of these impediments

amounted to a "substantial burden" that prevented him from worshiping freely as a Jehovah's

Witness.

As the Court explained in *Roy*:

The United States Constitution does not require prison and jail officials to provide
a special chapel or place of worship "for every faith regardless of size; nor must a
chaplain, priest, or minister be provided without regard to the extent of the
demand." *Cruz v. Beto*, 405 U.S. 319, 322 n. 2, 92 S.Ct. 1079, 31 L.Ed.2d 263
(1972). Where a facility has only one chapel, it does not violate the First
Amendment or the Fourteenth Amendment's equal protection clause if jail
officials give preference to larger groups. It is "not constitutionally impermissible

for Defendants to consider the demand and need of the group requesting the chapel, along with space and staffing limitations, when deciding where religious groups will conduct their services." *Baranowski v. Hart*, 486 F.3d 112, 123 (5th Cir. 2007) (Policies on availability of religious services to the less than 1% of prison population practicing the Jewish faith, which resulted in an inmate's being denied weekly Sabbath and other holy day services did not violate his free exercise rights).

*Roy*, 2012 WL 279485, at *4. Judge Moody concluded that while Roy did face certain impediments to his ability to practice his religion the way he would have preferred, those impediments did not *prevent* him from doing so, and held that the "defendants are entitled to summary judgment on Roy's claim that they improperly denied him access to group religious services at the jail chapel." *Id*.

Again, jails and prisons can impose all manner of restrictions on religious practices if those restrictions are legitimately related to jail security, administration or management, even if the restrictions prevent inmates from practicing their religion in exactly the *manner* they would prefer. *See, e.g.*, *Tarpley*, 312 F.3d 895 (inmate prohibited from having his personal Bible, which included his handwritten notes, and made to use jail-issued Bible); *Kaufman v. Pugh*, 733 F.3d 692, 697 (7th Cir. 2013) (dismissing inmate's free exercise claim because he could not show "that he would be unable to practice atheism effectively without the benefit of a weekly study group."); *Canedy v. Boardman*, 91 F.3d 30, 33 (7th Cir. 1996) (inmate's free exercise right does not "depend upon his ability to pursue each and every aspect of the practice of his religion"). Burns's own words show that he *was* permitted to attend services while incarcerated in the Lake County Jail, albeit under circumstances that he considered unpleasant and inconvenient. The facts of this case, set forth in great detail in Burns's many pleadings, do not support his claim that he was deprived of a reasonable opportunity to practice his religion as a result of official policy

17

of the Lake County Jail. Because Burns has failed to raise a genuine issue of material fact concerning his claim for denial of religious services, Defendants Chase and McClesky are entitled to summary judgment on his claims against them in their official capacity.

**C. Individual capacity claims.**

It is well established that "[l]iability under Section 1983 is predicated on a defendant's personal involvement in the alleged constitutional violation. *Palmer v. Marion Cnty.*, 327 F.3d 588, 594 (7th Cir. 2003) (citations omitted). To be personally responsible, an official 'must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye.'" *Jones v. Gaetz*, 2017 WL 1132560, at *5 (S.D. Ill. Mar. 27, 2017) (quoting *Knight v. Wiseman*, 590 F.3d 458, 463 (7th Cir. 2009)). Chase and McClesky argue that they had no such personal involvement in the events giving rise to this lawsuit and are therefore entitled to summary judgment on Burns's claim.

In his Amended Complaint and his response brief, Burns makes several factual assertions regarding the Defendants, including the following:

> 1) They ignored his repeated requests to attend services in the Jail chapel, or told him they would "look into it" but never did. (Plaintiff's Response, p. 1);
>
> 2) In April 2011, after Burns asked if he could attend services with other Jehovah's Witnesses, McClesky asked him "why do you want to be a camel?"–a comment Burns claims demonstrates religious bias since under "Leviticus dietary law a camel is one of the unclean beast[s]." (Amended Complaint, p. 4; Plaintiff's Response, p. 1);
>
> 3) He "gave my name and ID to the Jail's two chaplains and they never gave it to any of my ministers." (Plaintiff's Response, p. 5);
>
> 4) "The Defendants made it difficult on me to get spiritual guidance! I was deprived [of] religious visits because my minister was not allowed in the part of the Jail I was in." (Amended Complaint, p. 4);

5) "The two chaplains ignore[d] all of my letters and the letters of my ministers. The two chaplains ignore[d] all of my grievances." (*Id.*, p. 6);

6) Chase and McClesky personally interfered with his rights to worship by repeatedly preventing him from attending services with other Jehovah's Witness because he was not on a required list, even though they did not impose such a requirement on inmates of other religions. (*Id.*, pp. 6-7); and

7) Chase and McClesky impeded Burns's ability to meet with his minister, Hausmann, and when allowed to do so was sometimes forced to worship through a "crack in the door," while his minister sat outside the cell. (*Id.*, p. 6).

These events, Burns claims, demonstrate that the Defendants harbored prejudice against Jehovah's Witnesses and personally interfered with his ability to practice his religion. (*Id.*).

Chase and McClesky contend that "there is no evidence of individual action that Chase and McClesky discriminated against Burns in any manner that could give rise to a cause of action because they cannot dictate where in the jail someone practices their faith, as well as approving or disapproving a particular minister, rabbi, ima[m], etc." Defendants' Memorandum, p. 9. The Defendants reiterate that "there is no evidence regarding any personal involvement giving rise to liability for Chase and McClesky because the institution, i.e. the Lake County Jail, as well as those persons in charge of said institution are the policy makers" who determine what restrictions and parameters to place on inmates' religious practices. *Id.*, p. 5. The Defendants support this argument by referencing the Lake County Jail Inmate Handbook, which they attached as an exhibit to their memorandum, and drawing the Court's attention to the section in that handbook that sets forth the Jail's policy regarding religious practices. The Defendants explain that "[t]he Lake County Jail has the following policy on Religious Visitation: . . . Any inmate . . . can make a request for a jail visit from a minister for their particular religion or denomination;" . . . and that such visits are "allowed in one of the following locations: attorney booths, hall holding cells,

individual cells, or program rooms on an individual basis to provide any and all religious counseling or mentoring." *Id.*, p. 6. The Handbook also states that "[a]ny variance of this rule will be verified through the Warden's Office." *Id.*, p. 7. Therefore, argue Chase and McClesky, they are not responsible for Jail procedures or rules concerning religious practices, which are the province of the Warden. *Id.*, p. 9.

In support of their position, the Defendants present the affidavit of Nicey Gore, an officer at the Jail, who states, in relevant part, as follows:

> 4. As part of my responsibilities as Deputy Warden of Security, I was responsible for and am familiar with the Lake County Jail's policy on jail visitation, including religious visitation.
>
> 5. The Lake County Jail's Policy on Religious Visitation is as follows:
>
> > a) Any Inmate in the Lake County Jail can make a request for a jail visit from a minister for their particular religion or denomination;
> >
> > b) Once a minister is verified through the presentation of credentials, the visit will be approved and the minister will be placed on a visitation list;
> >
> > c) The visit is allowed in one of the following locations: attorney booths, hall holding cells, individual cells, or program rooms on an individual basis to provide any and all religious counseling or mentoring[;]
> >
> > d) The Lake County Jail has a Chapel Room on the third floor, however, it is only allowed for non-denominational services through the Jail Ministry Program;
>
> 6. During my tenure as Deputy Warden of Security and to my knowledge, Robert Bums was never denied visitation on an individual basis from a Minister of the Jehovah Witness denomination when he requested it and approved pursuant to the Lake County Policy.
>
> . . .
>
> 8. During my tenure as Deputy Warden of Security and to my knowledge, Robert Bums was never denied religious services on the [basis of] his standing as a

Jehovah Witness.

> 9. During my tenure as Deputy Warden of Security and to my knowledge, the Lake County Jail does not and did not discriminate against any particular faith of its detainees, provides neutral rules that apply to every faith, as well as making every reasonable accommodation based upon the secure nature of the Lake County Jail.

Defendants' Response, Aff. of Nicey Gore (DE 97-2). (Neither Chase nor McClesky submitted an affidavit, deposition excerpt, or other sworn statement.) In the *Roy* case, the defendants filed an affidavit from a Jail officer who recounted in great detail the Jail's efforts to accommodate Roy's religious practices, including listing specific dates during Roy's incarceration on which a Jehovah's Witness minister was present at the Jail, explaining how inmate religious requests are processed, and stating that Roy was denied group religious services only because there were too few inmates in the Jail at the time who requested to attend Jehovah's Witness services. *Roy*, 2012 WL 279485, at *2. In this case, Chase and McClesky don't even do that much. The only affidavits they submitted were Gore's (which merely reiterates the Jail's policy on religious accommodation and then concludes that it was never violated in Burns's case) and one from Phyllis Leto, a sergeant at the Jail (which notes that Burns was provided with a copy of the Inmate Handbook when he arrived at the Jail, but provides no other relevant assertions or information pertaining to any issue now before the Court). So, the Defendants' summary judgment argument is that they did not personally interfere with Burns's religious rights because the Jail's written policy expressly forbids such discriminatory treatment and because Burns "was never denied visitation on an individual basis" nor "denied religious services" because of his faith. But this is not enough to prevail on summary judgment since Burns's own sworn statements directly refute the Defendants' assertions, creating issues of fact and credibility.

Burns maintains that the Defendants' position is disingenuous. He claims that Chase and McClesky were essentially *de facto* administrators or officials when it came to implementing or managing the Jail's religious accommodation policy, in spite of the language in the Inmate Handbook (and directly refuting the statements made in Gore's affidavit). Burns alleges, for example, that "for the defendants to say the Jail's chaplains don't have anything to do with the running of the way the chapel is used [is] misleading[,]" because he asked both Defendants many times to be "put on the list" for group services and that they ignored him "for a long time before I was allowed to go to services." Plaintiff's Response, p. 6. And he directly refutes the Defendants' assertion, included in their brief and in Gore's affidavit, that the Jail chapel "is only allowed for non-denominational services." Burns states that "[t]he Defendants now say that the Jail chapel is for non-denomination[al] services only. That may be so at this time, but when I was at the Jail that is not how it was." Plaintiff's Response, p. 2. Burns states under oath that he *personally* attended services in the chapel twice for Baptist services and twice for Jehovah's Witness services. *Id.* And even when he was permitted to meet with his minister, Burns claims he was forced to do so under circumstances that made it virtually impossible for him to counsel and worship in a meaningful way (as when forced to do so through a crack in a door or in a crowded, noisy cell). He claims he pleaded with both Defendants repeatedly and filed grievances directed to them to remedy the situation but "to no avail." Even if they were not directly responsible for creating the Jail's religious policy, Burns argues that Chase and McClesky were bound by it (a fact they do not dispute) and intentionally ignored its mandates in his case. But the Jail's religious accommodation policy is irrelevant to the issue of the Defendants' personal involvement. Burns's contention is that both chaplains personally interfered with his ability to

counsel with Jehovah's Witness ministers and otherwise placed arbitrary restrictions on his

ability to worship, *in spite of* the Jail's written policy. And that's the key here. Chase and

McClesky cannot invoke the Jail's written policy, which appears nondiscriminatory and

accommodating on its face, coupled with Gore's conclusory assertions that Burns was "never

denied" religious services or visits from his minister, as the basis for obtaining summary

judgment. Burns's factual assertions directly refute the material facts on which the Defendants'

argument rests, which precludes summary judgment on this claim.

Once again, we return to the *Roy* case, in which Kevin Roy raised the same allegations of

direct interference with his free exercise rights, notwithstanding the Jail's written policy

purporting to prohibit such interference. The Court considered the Defendants' arguments and

Roy's factual assertions (all of which sound like an instant reply of the present case) and

concluded as follows:

> Defendants assert that . . . they provided Roy with religious visitation and services
> by Jehovah's Witness ministers, and provided him with private visitation booths
> and holding cells in his housing unit for one-on-one clergy visits and religious
> services. In his response, Roy states that "Jehovah's Witnesses were forced to
> hold religious services through the crack of a closed steel sliding door while our
> minister stood at the door from the hallway, and I stood at the opposite side of the
> door inside a loud dayroom . . . [and that] . . . it was extremely difficult to hear a
> muffled voice coming through a crack of a closed door while standing in a loud
> dayroom where the many different noises echo off the walls." . . . He further states
> under oath that "Jehovah's Witnesses were not allowed to use the smaller rooms
> or the one-on-one holding cells that defendants alleged in their statement of facts .
> . . [but they] were available to religious groups who were smaller in size." . . .

> Summary judgment is not the procedure to determine which facts are true: the
> Court must accept the nonmoving party's version of events as true, and "extract
> all reasonable inferences from the evidence in the light most favorable to the
> nonmoving party." *Matsushita Elec.* . . . , 475 U.S. 574, 586. . . . When material
> facts are in dispute, then the case must go to a jury. *Bell v. Irwin*, 321 F.3d, 637,
> 640 (7th Cir. 2003). Defendants make certain factual claims which Roy has

rebutted under oath, creating material issues of fact. If defendants' version of events is true, they provided Roy with an adequate opportunity to practice his religion and did not place substantial burden on his religious exercise. But if his version of events is true, a reasonable fact-finder could conclude that defendants violated his federally protected rights to practice his religion.

*Roy*, 2012 WL 279485, at *5. Similarly, Burns's sworn statements directly refute the Defendants' assertions and expose material fact issues and credibility issues that can only be resolved by a jury. Accordingly, the Defendants' motion for summary judgment is denied as to Burns's claims against them in their individual capacities for violation of his constitutional right to the free exercise of his religion.

## CONCLUSION

For the reasons discussed above, the Defendants' motion to strike (DE 103) is DENIED; the Defendants' motion for summary judgment (DE 96) is GRANTED in part, DENIED in part, and MOOT in part. The motion is denied as to Plaintiff's claims against the Defendants, in their individual capacities, for violation of his constitutional right to the free exercise of his religion; the motion is granted as to Plaintiff's claims against the Defendants in their official capacities and those claims are dismissed; and the motion is moot as to Plaintiff's claim under the Religious Land Use and Institutionalized Persons Act (RLUIPA). This case will be set for a scheduling conference by separate entry.

Dated: April 11, 2017.

 /s/   William C. Lee   
William C. Lee, Judge
United States District Court
Northern District of Indiana